IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEONARD A. WYCHOCKI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 2954 |
| v. ) | |
| ) | Magistrate Judge Nan R. Nolan |
| FRANCISCAN SISTERS OF ) | |
| CHICAGO, *et al.*, ) | |
| ) | |
| Defendants. ) | |

# MEMORANDUM OPINION AND ORDER

Defendants Franciscan Sisters of Chicago and Franciscan Sisters of Chicago Service Corporation (collectively, "Franciscan Sisters") move to quash or modify the document subpoenas issued by Plaintiff Leonard A. Wychocki to McDermott Will & Emery LLP ("McDermott") and Sullivan, Cotter & Associates, Inc. ("Sullivan Cotter"). Wychocki moves to compel the production of documents containing communications with Sullivan Cotter and requests sanctions.[1] For the reasons stated below, the motions are granted in part and denied in part.

## I. BACKGROUND

Wychocki filed suit against Franciscan Sisters for recovery of deferred compensation and benefits allegedly due under a deferred compensation plan. (Compl. ¶ 3.) Franciscan Sisters operates long term care, senior housing facilities and community

---

[1] The Court grants Third Party Defendant and Counter Plaintiff Julie Secviar's motion to join Wychocki's Motion to Compel.

based services in five states. (*Id.* ¶ 4; Countercl. ¶ 2; Doc. 101 Ex. A.) Wychocki was Franciscan Sisters' President and Chief Executive Officer from 1994 through 2006. (Compl. ¶ 4; Countercl. ¶¶ 4, 9.) Third Party Defendant and Counter Plaintiff Julie Secviar was hired in 1998 as the Vice President of Human Resources for Franciscan Sisters. (Countercl. ¶¶ 5, 11.) She was later promoted by Wychocki to the position of Vice President of Strategic Resources. (*Id.* ¶ 11.) Her responsibilities included managing compensation and benefits for all of Franciscan Sisters' employees and executives. (*Id.*) Secviar left Franciscan Sisters in 2008. (*Id.* ¶ 23.)

In late 2000 or early 2001, Wychocki approached Franciscan Sisters' Board of Directors ("Board") and requested additional retirement benefits in the form of a Supplemental Executive Retirement Plan ("SERP"). (Compl. ¶ 6; Countercl. ¶ 12.) The Board instructed Secviar to retain an executive compensation consulting firm with expertise on SERPs to obtain an independent proposal regarding an appropriate SERP benefit for Wychocki. (Countercl. ¶ 14.) While the Board authorized Secviar to obtain Wychocki's input, she was instructed to obtain the consulting firm's independent recommendations regarding the appropriate level of a SERP benefit for an officer in Wychocki's position. (*Id.* ¶ 15.)

Secviar engaged Clark/Bardes Consulting ("Clark/Bardes") to provide the independent proposal. (Compl. ¶ 6; Countercl. ¶ 16.) Clark/Bardes was "experienced in determining the types and levels of compensation and benefits being provided to executives in the marketplace and familiar with types and levels of compensation and benefits being provided to executives of not-for-profit organizations." (Countercl. ¶

16.) Although the SERP was made retroactive to July 2001, it was not finalized until shortly before Wychocki took early retirement in December 2006. (Compl. ¶¶ 6–8.) Subsequent to his retirement, Wychocki acknowledges that Franciscan Sisters paid him "substantial monetary benefits" but contends that they withheld approximately $800,000 that was due him pursuant to the SERP and withheld payment of other benefits which have an approximate value of $300,000. (*Id.* ¶ 10.)

Franciscan Sisters filed a counterclaim and third-party complaint against Wychocki and Secviar, respectively, alleging fraud, fraud in the inducement, conspiracy to commit fraud, breach of fiduciary duty, unjust enrichment and breach of contract. (Countercl. ¶¶ 1, 83–144.) Franciscan Sisters contend that Wychocki and Secviar schemed to obtain a SERP for Wychocki that was significantly in excess of what Clark/Bardes had recommended. (*Id.* ¶¶ 17–18, 21–23.) In furtherance of their scheme, Wychocki and Secviar withheld from the Board information about the $1 million SERP actually recommended by Clark/Bardes and instead directed Clark/Bardes to design a plan that would yield a $3.5 million benefit. (*Id.* ¶¶ 21–23, 29–31.) Despite the fact that the $3.5 million plan was based on Wychocki and Secviar's parameters, Wychocki and Secviar "intentionally misled" the Board to believe that the plan was based on Clark/Bardes's recommendations. (*Id.* ¶ 33.)

In July 2001, the Board, unaware of Clark/Bardes's $1 million SERP recommendation, accepted Wychocki and Secviar's recommendations and instructed Secviar to draft the SERP agreement, which she never did. (Countercl. ¶¶ 32–41.) Several months later, despite the fact that there was no SERP document, Wychocki

and Secviar directed Franciscan Sisters' chief financial officer to make a $1.5 million deposit into a special trust account dedicated to funding Wychocki's SERP. (*Id.* ¶ 44.) Several years later, when it was discovered that the SERP had never been drafted, Wychocki and Secviar represented to the Board that it had previously approved the SERP. (*Id.* ¶¶ 48–50.)

In connection with drafting the SERP and finalizing Wychocki's severance package in 2004 and 2005, Franciscan Sisters retained Sullivan Cotter to issue an opinion regarding the reasonableness of Wychocki's total compensation package. (Countercl. ¶ 51; *see* Compl. ¶ 7.) Secviar was responsible for providing information to Sullivan Cotter regarding Wychocki's compensation, including the SERP component. (Countercl. ¶ 52.) Franciscan Sisters contend "the only information that Secviar provided to Sullivan Cotter was Clark's flawed October 2001 report[,] the SERP parameters designed by Secviar and Wychocki[,] and their recollection of the terms approved in 2001." (*Id.* ¶ 53.) "Based on Secviar's representations, Sullivan Cotter was led to believe that all of these SERP parameters had already been approved by the Board and, therefore, required no critical analysis." (*Id.* ¶ 54.)

In late 2004, Franciscan Sisters contend that Secviar "orchestrated" a Board meeting and persuaded the Board "to confirm SERP design details under the guise they were already discussed and approved in July 2001, when, in fact, such details had never been discussed or approved at any time." (Countercl. ¶ 95.) "In March 2005, the Board approved a SERP document that contained Wychocki's desired parameters, but only because the Board had been told that these parameters had been

previously discussed and approved . . . in July of 2001." (*Id.* ¶ 96.) Franciscan Sisters assert damages of at least $2.7 million. (*Id.* ¶ 98.)

## II. DISCUSSION

"A party has a general right to subpoena any person to . . . produce documents for inspection and copying." *Davis v. City of Springfield*, 2009 WL 910204, at *2 (C.D. Ill. Apr. 1, 2009) (citing Fed. R. Civ. P. 45). "The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." *Wallace v. Hounshel*, 2008 WL 89933, at *2 (S.D. Ind. Jan. 2, 2008). In other words, "a subpoena will survive a motion to quash when it designates topics that are reasonably calculated to lead to admissible evidence." *Stock v. Integrated Health Plan, Inc.*, 241 F.R.D. 618, 621 (S.D. Ill. 2007). Nevertheless, the court "must quash or modify a subpoena" that "requires the disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(c)(3)(A)(iii).

Under Rule 37, a party may move to compel discovery where another party fails to respond to a discovery request or where the response is evasive or incomplete. Fed. R. Civ. P. 37(a)(3)–(4). "In ruling on motions to compel discovery, courts have consistently adopted a liberal interpretation of the discovery rules." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) (citation omitted); *see Cannon v. Burge*, 2010 WL 3714991, at *1 (N.D. Ill. Sept. 14, 2010) ("The federal discovery rules are liberal in order to assist in trial preparation and settlement."); *Bond v. Utreras*, 585 F.3d 1061, 1075 (7th Cir. 2009). "Courts commonly look unfavorably upon significant restrictions placed upon the discovery process" and the

"burden rests upon the objecting party to show why a particular discovery request is improper." *Kodish*, 235 F.R.D. at 450; *accord Cannon*, 2010 WL 3714991, at *1. As with all discovery matters, the Court has broad discretion whether to compel discovery. *See Kodish*, 235 F.R.D. at 450.

Because Wychocki's claims and Franciscan Sisters' counterclaims arise under Illinois law, the issue of attorney-client privilege is governed by Illinois law. Fed. R. Evid. 501. Under Illinois law, "the purpose of the attorney-client privilege is to encourage and promote full and frank consultation between the client and legal advisor by removing the fear of compelled disclosure of information." *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432 N.E.2d 250, 256 (Ill. 1982). In defining the attorney-client privilege, the Illinois Supreme Court "has stated that where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal adviser, except the protection be waived." *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 727 N.E.2d 240, 243 (Ill. 2000).

Franciscan Sisters' Motion to Quash requests that the Court quash or modify the subpoenas to "preclude Wychocki from compelling the production of privileged materials to which he has no right." (Mot. to Quash 2.) Franciscan Sisters contend that the subpoenas to McDermott and Sullivan Cotter should be quashed or modified because they seek the production of materials that are subject to attorney-client privilege. (*Id.* 4–7.)

Wychocki's Motion to Compel seeks production of all documents in Franciscan Sisters' possession relating to communications with Sullivan Cotter. (Mot. to Compel 1–2.) Wychocki asserts that Franciscan Sisters have "no colorable claim of privilege as to the Sullivan Cotter documents." (*Id.* ¶ 3.) Wychocki also requests sanctions. (*Id.* ¶ 11.)

As part of the meet and confer process, the parties identified a number of other issues relating to Franciscan Sisters' document production. (Joint Status Report 2–3.) After subsequent conferences with the Court, most issues have been resolved.[2] (*See* Second Joint Status Report 6–7; Court's Order of 5/4/2011.) The following issues remain unresolved and are the focus of this Order: (1) the application of the attorney-client privilege to communications between McDermott partner Ralph DeJong and Secviar; (2) the application of the attorney-client privilege among DeJong, Franciscan Sisters and Sullivan Cotter; (3) whether an "at issue" waiver of the attorney-client privilege has occurred with respect to communications among DeJong, Franciscan Sisters and Sullivan Cotter; and (4) the application, if any, of the fiduciary-duty exception to any assertions of attorney-client privilege. (Second Joint Status Report 6–7; *see* Joint Status Report 3–7, 10–11.)

---

[2] The parties tabled the issue as to whether Franciscan Sisters intend to designate any attorneys from the law firm of Kaye Scholer LLP as witnesses. (Court's Order of 5/4/2011; *see* Joint Status Report 10; Second Joint Status Report 7, 8.) As of May 4, 2011, the parties were still working to resolve whether Linda Hornyak was a member of Franciscan Sisters' control group and whether any communications between Franciscan Sisters and Steve Smith of Krieg DeVault LLP are subject to Franciscan Sisters' assertion of attorney-client privilege. (Second Joint Status Report 7–8; Court's Order of 5/4/2011.)

## A. Communications Between McDermott and Secviar

Wychocki and Secviar question how communications between DeJong and Secviar, a party to this litigation, can be privileged. (Joint Status Report 3–4.) Franciscan Sisters respond that because those communications were directed to Secviar in her capacity as a Franciscan Sisters officer, they are privileged and Secviar has no authority to waive the privilege. (*Id.*)

"Illinois law confines attorney-client privilege protection in the corporate environment to communications involving the corporation's 'control group.'" *Motorola, Inc. v. Lemko Corp.*, 2010 WL 2179170, at *2 (N.D. Ill. June 1, 2010). The control group includes top management as well as employees "whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority." *Consolidation Coal*, 432 N.E.2d at 258; *see also, e.g., Sterling Fin. Mgmt., L.P. v. UBS PaineWebber, Inc.*, 782 N.E.2d 895, 900 (Ill. App. Ct. 2002). The parties do not dispute, for purposes of the present motion, that Secviar was a member of the Franciscan Sisters control group during the relevant time period. (*See* Joint Status Report 3–4.)

Although Secviar may have been in the control group when the communications with counsel (DeJong) were made, once she left the Franciscan Sisters' employ, the privilege did not leave with her. Attorney-client privilege does not belong to the individual control-group member; it belongs to the corporation because the corporation is the client. *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 277 (N.D. Ill. 2004) (analyzing Illinois law); *see CFTC v. Weintraub*, 471 U.S. 343, 349 (1985) ("When

control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. . . . Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."); *Hayes v. Burlington N. & Santa Fe Ry.*, 752 N.E.2d 470, 474 (Ill. App. Ct. 2001) (in corporate context, court held that "the attorney-client privilege belongs to and can only be waived by the client"). "At all times, the privilege resided in the corporation, and not in the individual officers or directors who at any given time comprised the control group." *Dexia*, 231 F.R.D. at 277. Thus, once Secviar's control group status terminated, so did her right of access to Franciscan Sisters' privileged documents. *Dexia*, 231 F.R.D. at 277. Consequently, Secviar's status as a former control-group member of Franciscan Sisters does not entitle her to see privileged documents that she saw, or to which she had access, during the time she was employed by Franciscan Sisters.[3]

## B. Communications Among McDermott, Franciscan Sisters and Sullivan Cotter

Franciscan Sisters contend that communications among McDermott, Sullivan Cotter and Franciscan Sisters fall within the ambit of attorney-client privilege and that Franciscan Sisters have not waived the privilege as to any of those communications. (Doc. 74 at 5–6.) Specifically, Franciscan Sisters assert that "Sullivan Cotter

---

[3] While the Illinois Supreme Court has not weighed in on this issue, the Court agrees with *Dexia* that not allowing a former control group member access to privileged documents is consistent with the Illinois rule that, "in a corporate setting, the privilege resides with the corporation, as the client, and not in the individuals who are in the control group at any given time." *Dexia*, 231 F.R.D. at 279; *see Hayes*, 752 N.E.2d at 474.

was retained to assist McDermott in advising [Franciscan Sisters] regarding the reasonableness of Wychocki's total severance package." (*Id.* 7.) Thus, "Sullivan Cotter acted as McDermott's agent for purposes of advising the Franciscan Sisters in the negotiation of Wychocki's severance package." (*Id.* 8.) Wychocki and Secviar counter that Sullivan Cotter provided business—not legal—advice to Franciscan Sisters. (Doc. 101 at 9–12; *see* Doc. 102.) Just because McDermott was an intermediary between Sullivan Cotter and Franciscan Sisters does not render the communications privileged. (Doc. 101 at 10.)

Generally, the presence of a third party indicates a lack of intention to keep communications between a client and her attorney confidential, and the attorney-client privilege does not apply. *People v. Doss*, 514 N.E.2d 502, 505 (Ill. App. Ct. 1987). Thus, "a defendant's voluntary disclosure of information, or other matters subject to being testified to, in the presence of opposing counsel or any other third person who is not the agent of the defendant or his attorney is not privileged." *People v. Simms*, 736 N.E.2d 1092, 1117 (Ill. 2000); *see In re Marriage of Johnson*, 604 N.E.2d 378, 387 (Ill. App. Ct. 1992) ("Matters which the client intends his attorney to disclose to a third person (who is not the agent of either the client or the attorney) are not privileged.").

However, the Illinois Supreme Court has observed that "a privileged or protected communication does not have to be made directly to the attorney rather than an agent of the attorney, because the privilege protects communications to the *attorney's clerks* and his other agents (including stenographers) for rendering his ser-

vices. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents." *People v. Knuckles*, 650 N.E.2d 974, 976–77 (Ill. 1995) (citation omitted). Thus, the attorney-client privilege applies to communication between a party or her agent and her lawyer or her lawyer's representatives. *See Midwesco-Paschen Joint Venture for Viking Projects v. Imo Indus., Inc.*, 638 N.E.2d 322, 327 (Ill. App. Ct. 1994); ILCS S. Ct. R. 201(b)(2); *Simms*, 736 N.E.2d at 1117 ("The presence of an agent of the client in furtherance of the client's business or the presence of representatives of the lawyer does not destroy the privilege.").

Nevertheless, the attorney-client privilege is restricted to confidential *legal* advice; financial or business advice is not protected by the privilege. *CRN Invs., Inc. v. Jefferson Trust & Sav. Bank of Peoria*, 451 N.E.2d 580, 583 (Ill. App. Ct. 1983); *see In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only accounting service or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.") (citations and alterations omitted). Thus, "material transmitted to [a third party] may fall under the attorney-client privilege [only] if the [third party] is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice." *In re Grand Jury Proceedings*, 220 F.3d at 571; *cf. CNR Invs.*, 451 N.E.2d at 583 ("An examination of the document discloses that it

vices. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents." *People v. Knuckles*, 650 N.E.2d 974, 976–77 (Ill. 1995) (citation omitted). Thus, the attorney-client privilege applies to communication between a party or her agent and her lawyer or her lawyer's representatives. *See Midwesco-Paschen Joint Venture for Viking Projects v. Imo Indus., Inc.*, 638 N.E.2d 322, 327 (Ill. App. Ct. 1994); ILCS S. Ct. R. 201(b)(2); *Simms*, 736 N.E.2d at 1117 ("The presence of an agent of the client in furtherance of the client's business or the presence of representatives of the lawyer does not destroy the privilege.").

Nevertheless, the attorney-client privilege is restricted to confidential *legal* advice; financial or business advice is not protected by the privilege. *CRN Invs., Inc. v. Jefferson Trust & Sav. Bank of Peoria*, 451 N.E.2d 580, 583 (Ill. App. Ct. 1983); *see In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only accounting service or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.") (citations and alterations omitted). Thus, "material transmitted to [a third party] may fall under the attorney-client privilege [only] if the [third party] is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice." *In re Grand Jury Proceedings*, 220 F.3d at 571; *cf. CNR Invs.*, 451 N.E.2d at 583 ("An examination of the document discloses that it

does not impart any legal advice but instead contains the accountant's views concerning matters of financial disclosure."). Finally, "the burden of showing facts which give rise to the privilege rests on the one who claims the exemption." *Consolidation Coal*, 432 N.E.2d at 257; *see In re Grand Jury Proceedings*, 220 F.3d at 571 ("The party seeking to establish the privilege bears the burden of demonstrating that all of the requirements for invoking the attorney-client privilege have been met."). "The claimant must show certain threshold requirements in order to avail itself of the privilege, including a showing that the communication originated in confidence and that it was not disclosed except to certain authorized parties, i.e., the 'control group' of a corporation." *CNR Invs.*, 451 N.E.2d at 583.

Here, Franciscan Sisters have not met their burden to demonstrate that the attorney-client privilege applies to communications with Sullivan Cotter. First, there is no evidence that Sullivan Cotter was acting as McDermott's agent or representative. *Cf. Simms*, 736 N.E.2d at 1117 ("The presence of an agent of the client in furtherance of the client's business or the presence of representatives of the lawyer does not destroy the privilege."). While McDermott made recommendations to Franciscan Sisters as to which compensation consultants to consider, it was Franciscan Sisters which decided which consultant to hire. (Doc. 101 Exs. B, C ("The consultant selected by [Franciscan Sisters] is Jim Freundt of Sullivan Cotter." "Please understand that, while [DeJong] provided suggested names of consultants at [Franciscan Sisters'] request, this is a decision of [Franciscan Sisters]."); Doc 88 Ex. A at 3 (Secviar handwritten note indicating that Franciscan Sisters made the decision to

use Sullivan Cotter for Wychocki's compensation review), Ex. B at 3 ("Sullivan Cotter providing report for benefit of [Franciscan Sisters Board]").) It was Franciscan Sisters which "sought and received independent professional advice" from Sullivan Cotter. (Doc. 101 at 5; *see* Countercl. ¶ 51 ("In connection with memorializing the SERP and finalizing the Severance Agreement in 2004-2005, [Franciscan Sisters] retained [Sullivan Cotter] to issue an opinion regarding the reasonableness of Wychocki's total compensation package.").) Although Sullivan Cotter sent its invoices to McDermott, the invoices were forwarded to Franciscan Sisters with instructions that Franciscan Sisters should pay Sullivan Cotter directly. (Doc. 101 Ex. E; *see id.* Ex. B ("The cost of Sullivan Cotter's fees should be paid by [Franciscan Sisters], since this relates to [Wychocki's] compensation and is the kind of reasonableness analysis that is often conducted annually . . . .").)

Franciscan Sisters contend that "Sullivan Cotter acted as McDermott's agent for purposes of advising the Franciscan Sisters in the negotiation of Wychocki's severance package, particularly with respect to whether Wychocki's severance package as a whole complied with applicable tax regulations." (Doc. 100 at 5.) However, Franciscan Sisters have provided no evidence in support of this conclusory statement. *See Consolidation Coal*, 432 N.E.2d at 257 ("The burden of showing facts which give rise to the privilege rests on the one who claims the exemption."). Further, Franciscan Sisters have provided no proof that McDermott gave Sullivan Cotter any direction or that Sullivan Cotter sent any information to McDermott to assist it in advising Franciscan Sisters whether Wychocki's severance package complied with tax

laws. In fact, McDermott and Sullivan Cotter provided separate opinions to the Board on different subject matters—McDermott on whether Wychocki's compensation package complies with tax regulations and Sullivan Cotter on how Wychocki's compensation package compares to those provided to CEOs by organizations of a similar size in the long-term care industry. (Doc. 88 at 4; Doc. 101 Ex. B.)

Second, the evidence clearly indicates that Sullivan Cotter was providing business—not legal—advice. *See In re Grand Jury Proceedings*, 220 F.3d at 571 ("What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*."). Sullivan Cotter "is a human resources management consulting firm specializing in healthcare compensation consulting." (Doc. 97 Ex. A.) Franciscan Sisters hired Sullivan Cotter "to provide the market analysis of CEO compensation and benefits." (Doc. 101 Ex. E.) Sullivan Cotter "examined market comparability data, . . . compared all forms of compensation and benefits provided to [Wychocki] to market data, and . . . concluded that the total compensation and benefits provided to [Wychocki] are in the range of 80th to 90th percentiles of market data." (*Id.* 5.) Sullivan Cotter provided Franciscan Sisters with a letter that "summarizes the compensation and benefits arrangements, sets forth the comparability data, and reaches conclusions as to the level of support in the data for the arrangements being provided."[4] (*Id.* Ex. B.) Based on Sullivan Cotter's *market analysis*, the Board approved Wychocki's severance package. (*Id.* 5–6.)

---

[4] In this regard, the Sullivan Cotter opinion was similar to the Clark/Bardes opinion, which was produced without a claim of privilege. (*See* Doc. 88 Ex. A at 5 (stating that Sullivan Cotter was retained to review Wychocki's compensation package "much as Clark Consulting did for [Franciscan Sisters] in 2001").)

Third, the letters exchanged among McDermott, Sullivan Cotter and Franciscan Sisters regarding Sullivan Cotter's retention appear designed to cloak the correspondence with Sullivan Cotter as attorney-client privilege when Sullivan Cotter was neither an agent of McDermott nor providing Franciscan Sisters with confidential legal advice. For example, DeJong's letter to Secviar explained that McDermott was involved in the selection of Sullivan Cotter "to take the position, if at all possible, that Sullivan Cotter is preparing its work product to enable [McDermott] to prepare legal advice to [Franciscan Sisters] on certain matters involving legal risk." (Doc. 101 Ex. E.) However, the retention letter says nothing about Sullivan Cotter analyzing legal risk. (*See* Doc. 97 Ex. A.) Similarly, while the retention letter suggests that Sullivan Cotter will be working under McDermott's direction (*see id.*), both McDermott and Franciscan Sisters emphasized that Franciscan Sisters made the decision to hire Sullivan Cotter and that Sullivan Cotter would submit its report directly to Franciscan Sisters. (Doc. 101 at 4–5 & Exs. B, C.)

In sum, the Court finds that Sullivan Cotter was not an agent of McDermott and that Sullivan Cotter's work product and communications with McDermott and Franciscan Sisters are not protected from discovery by the attorney-client privilege.[5]

---

[5] Even if the Court found that Sullivan Cotter was an agent of McDermott, the Court likely would find waiver pursuant to the "at issue" doctrine. "Typically, attorney-client privilege may be waived if an otherwise privileged communication is put 'at issue' by a party who is a holder of the privilege." *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 324 (N.D. Ill. 2008). "Under Illinois law, an at-issue waiver occurs where the sought after material is either the basis of the lawsuit or the defense thereof." *Id.* It is not sufficient that a party merely deny an allegation, or that the documents are relevant to the claim. *Dexia*, 231 F.R.D. at 276. Rather, communications are waived only when the litigant directly puts the attorney's advice at issue in the litigation. *In re Estate of Wright*, 881 N.E.2d 362, 367 (Ill. App. Ct. 2007). Thus, "the 'at issue' waiver doctrine narrowly applies

## C. Fiduciary-Duty Exception to Attorney-Client Privilege

Wychocki and Secviar contend that the fiduciary-duty exception applies because Wychocki, as a beneficiary of an employee-benefits plan, has a right to discover communications between a plan fiduciary—Franciscan Sisters—and attorneys—McDermott (DeJong). (Joint Status Report 10–11; *see* Second Joint Status Report 6–7.) Franciscan Sisters assert that the fiduciary-duty exception does not apply because Wychocki's severance package is not an ERISA plan, and, even if it were, any communications between Franciscan Sisters and DeJong regarding the negotiations of the severance package terms did not involve the ordinary affairs of administering

---

only when the privilege holder puts the communications directly at issue in the lawsuit." *Edgewater Med. Ctr. v. Rogan*, 2010 WL 2711448, at *10 (N.D. Ill. July 6, 2010).

Here, Franciscan Sisters' Third Party Complaint contends that Sullivan Cotter did not conduct a "critical analysis" because Secviar "led [Sullivan Cotter] to believe that all of these SERP parameters had already been approved by the Board." (Countercl. ¶ 54.) Further, Franciscan Sisters assert that had "the Board been aware of the material representations made by Wychocki and Secviar in 2001 and 2004," the Board would not have "approved the SERP designed by Wychocki." (*Id.* ¶ 97.) In essence, Franciscan Sisters allege that contrary to the Board's statement that Sullivan Cotter made an "independent" evaluation of Wychocki's compensation package after conducting a "market analysis" (Doc. 101 at 5), Secviar's actions somehow caused Sullivan Cotter to accept Secviar's representations without conducting its own analysis. (*See* Countercl. ¶¶ 51–54, 96–97.) Clearly, this puts Sullivan Cotter communications directly "at issue" and waives any attorney-client privilege that may have prevented their disclosure.

Franciscan Sisters contend that the Third Party Complaint focuses only on the SERP, which they allege was procured through fraud and breaches of fiduciary duty, and not on the severance package as a whole. (Doc. 97 at 14.) Because the Third Party Complaint alleges that Sullivan Cotter accepted Wychocki and Secviar's representations about the SERP without any critical analysis, Franciscan Sisters assert that Sullivan Cotter's reasonableness analysis is immaterial to the claims in the Third Party Complaint. (*Id.*) This is a distinction without a difference, however. To defend against the Counterclaim and the Third Party Complaint, Wychocki and Secviar are entitled to discover whether Sullivan Cotter, in issuing its reasonableness opinion on Wychocki's total compensation package (Countercl. ¶ 51), conducted an independent, critical market analysis of the SERP parameters (*id.* ¶ 54; *see* Doc. 101 at 5).

the plan, but instead were the negotiation of a benefit specific to Wychocki. (Joint Status Report 11.)

Many courts, including the Seventh Circuit, have recognized the existence of a fiduciary exception to the attorney-client privilege. *See, e.g., Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 787 (7th Cir. 2005); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 422 (N.D. Ill. 2006). "The fiduciary-duty exception arose in the context of trust law, and was historically based on the principle that the true owner of a trust is the trust's beneficiary, who possesses all of the legal rights associated with the trust and toward whom the trustee has a fiduciary duty." *Mueller Indus., Inc. v. Berkman*, 927 N.E.2d 794, 806 (Ill. App. Ct. 2010). "In essence, the beneficiary, not the trustee, was the true 'client' of the attorney, and so was the real possessor of the attorney-client privilege. The beneficiary could therefore discover the communications between the attorney and the trustee without being subject to assertion of the attorney-client privilege." *Id.*

The fiduciary-duty exception "applies upon a showing of a fiduciary relation and good cause for overcoming the privilege." *Jaffe Pension Plan*, 244 F.R.D. at 422. It "is based on the notion that a communication between an attorney and a client is not privileged from those to whom the client owes a fiduciary duty." *J.H. Chapman Group, Ltd. v. Chapman*, 1996 WL 238863, at *1 (N.D. Ill. May 2, 1996). "In recent years, American courts have applied the fiduciary-duty exception in two situations outside of its original trust context: actions against ERISA fiduciaries and derivative shareholder suits." *Mueller*, 927 N.E.2d at 806. In the first situation, the Sev-

enth Circuit has held that beneficiaries of an employee-benefits plan have a right to discover the communications between plan fiduciaries and attorneys regarding the administration of the plan. *See Bland*, 401 F.3d at 787–88.

Here, the Court declines to find a fiduciary-duty exception to the privileged communications between Franciscan Sisters and McDermott. First, Illinois has not adopted the fiduciary-duty exception. *Mueller Indus.*, 927 N.E.2d at 807. Second, it does not appear that Wychocki's severance package was an ERISA plan. Finally, even if the severance package was an ERISA plan, the communications between Franciscan Sisters and DeJong regarding the negotiation of Wychocki's severance package do not involve the routine affairs of administering the plan.

### III. CONCLUSION

As discussed above, Sullivan Cotter was not an agent of McDermott. Franciscan Sisters' claim of privilege regarding the Sullivan Cotter documents is denied. Thus, Franciscan Sisters' motion to quash the Sullivan Cotter subpoena is denied. Sullivan Cotter shall produce all documents responsive to the subpoena. Plaintiff Wychocki's motion to compel the production of documents containing communications with Sullivan Cotter is granted. Franciscan Sisters shall produce all responsive Sullivan Cotter documents in their possession, custody or control.

However, Secviar's status as a former control-group member of Franciscan Sisters does not entitle her to see privileged documents that she saw, or to which she had access, during the time she was employed by Franciscan Sisters. Further, the fiduciary-duty exception does not apply to privileged communications between

Franciscan Sisters and McDermott. Thus, the McDermott subpoena is modified to preclude the production of materials subject to the attorney-client privilege. McDermott shall produce all nonprivileged documents responsive to the subpoena.

Wychocki's request for sanctions is denied.

Third Party Defendant and Counter Plaintiff Secviar's Motion to Join Wychocki's Motion to Compel [90] is **GRANTED**. Defendants' Motion to Quash [66] and Plaintiff Wychocki's Motion to Compel [88] are **GRANTED in part and DENIED in part**.

E N T E R:

Dated: June 15, 2011

*Nan R. Nolan*

NAN R. NOLAN
United States Magistrate Judge